AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT

04/23/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

April 23, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

United States of America,

v.

Angel Ramos-Corrales,

Defendant.

Case No.  5:21-mj-00309

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 13, 2021 in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 48(a)(1) | Animal Crushing |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
*Complainant's signature*

FBI Special Agent Colin L. Schmitt
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     April 23, 2021

*Judge's signature*

City and state:   Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Julius J. Nam (213-590-6188)

## AFFIDAVIT

I, Colin L. Schmitt, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a criminal complaint charging Angel RAMOS-CORRALES ("RAMOS-CORRALES") with a violation of Title 18, United States Code, Section 48(a)(1) (Animal Crushing).

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.   BACKGROUND OF AFFIANT

3.   I am a Special Agent ("SA") with the FBI, and have been so employed since April of 1997.  I am currently assigned to the Palm Springs Resident Agency of the Los Angeles Field Office, where I investigate crimes involving Frauds and Swindles, Drug Trafficking and Violent Crimes.  I have a Bachelor of Science in Accounting and a Bachelor of Science in Business Administration from the University of Missouri-Columbia.  I have a Master of Business Administration from

Northeastern University.  I am a Certified Fraud Examiner as
designated by the Association of Certified Fraud Examiners.  I
am a Certified Anti-Money Laundering Specialist as designated by
the Association of Certified Anti-Money Laundering Specialists.
I have received training and gained experience in interviewing
and interrogation techniques, arrest procedures, search warrant
applications, the execution of searches and seizures, computer
crimes, computer/telephone evidence identification,
computer/telephone evidence seizure and processing, and various
other criminal laws and procedures.  I have personally
participated in the execution of search warrants involving the
search and seizure of computer equipment, smartphones, documents
and other indicia of criminal activity.  As an FBI SA and
Supervisory SA, I have participated in and supervised various
federal investigations and prosecutions.  Through training and
discussions with the United States Attorney's Office, I have
become very familiar with violations of Title 18, United States
Code, Sections 48(a)(1) (Animal Crushing), 48(a)(2) (Creating
Animal Crush Videos), and 48(a)(3) (Distributing Animal Crush
Videos).

     4.    Through my training, and experience, I have become
familiar with the methods of which persons injure and kill
animals.  I am also familiar with analysis and posting of
digital media through various child porn investigations that I
have participated.  I have attended various general fraud, money
laundering, drug trafficking, violent crime, healthcare fraud
and white-collar investigative trainings sponsored by the FBI

and other organizations.  I have participated in and supervised investigative activities, arrest and search warrants, interviews, consensually-recorded conversations, trial preparation, bank record analysis, telephone toll record analysis and subpoena preparation.  As a result of my training and experience, I am familiar with federal laws relating to animal crushing, as well as, investigative techniques related to investigation of violent crime.

### III. THE ANIMAL CRUSH VIDEO PROHIBITION ACT OF 2010 AND THE PREVENTING ANIMAL CRUELTY AND TORTURE ACT OF 2019, 18 U.S.C. § 48

5.     This investigation concerns alleged violations of Title 18, United States Code, Section 48(a), which generally[1] prohibits any person to (1) "purposely engage in animal crushing in or affecting interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States," (2) "knowingly create an animal crush video if the person intends or has reason to know that the animal crush video will be distributed in, or using a means or facility of, interstate or foreign commerce, or the animal crush video is distributed in, or using a means or facility of, interstate or

---

[1] Notably, the statute "does not apply with regard to any conduct, or a visual depiction of that conduct, that is (A) a customary and normal veterinary, agricultural husbandry, or other animal management practice; (B) the slaughter of animals for food; (C) hunting, trapping, fishing, a sporting activity not otherwise prohibited by Federal law, predator control, or pest control; (D) medical or scientific research; (E) necessary to protect the life or property of a person; or (F) performed as part of euthanizing an animal."  18 U.S.C. § 48(d)(1).  The statute also does not apply to "unintentional conduct that injures or kills an animal."  18 U.S.C. § 48(d)(3).

foreign commerce," and (3) "knowingly sell, market, advertise, exchange, or distribute an animal crush video in, or using a means or facility of, interstate or foreign commerce."

6.   The following definitions and descriptions apply to this Affidavit:

a.   "Animal crushing," as defined in 18 U.S.C. § 48(f)(1), means "actual conduct in which one or more living non-human mammals, birds, reptiles, or amphibians is purposely crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury (as defined in [18 U.S.C. § 1365] and including conduct that, if committed against a person and in the special maritime and territorial jurisdiction of the United States, would violate [18 U.S.C. §§ 2241 or 2242])."

i.   "Serious bodily injury" is defined in 18 U.S.C. § 1365(h)(3) as "bodily injury which involves -- (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty."

ii.   "Bodily injury" is further defined in 18 U.S.C. § 1365(h)(4) as "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of the function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary."

iii. "Serious bodily injury," as referenced in 18 U.S.C. §§ 2241, 2242, is defined in 18 U.S.C. § 2246(4) as:

"bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty."

      b.   "Animal crush video," as defined in 18 U.S.C. § 48(f)(2), means "any photograph, motion-picture film, video or digital recording, or electronic image that -- (A) depicts animal crushing; and (B) is obscene."

## IV.   SUMMARY OF PROBABLE CAUSE

    7.   On February 13, 2021, the Riverside Police Department ("RPD") in Riverside, California received a report that RAMOS-CORRALES had posted on Snapchat, a multimedia messaging application used on smartphones, a video of a dog whose throat had been slit ("Snapchat Video").

    8.   That day, RPD officers met with the reporting person and reviewed the Snapchat Video on that person's smartphone. The video showed a small brown dog lying on its right side with a large laceration to the neck.  The accompanying caption at the bottom of the video read, "Tha next one rinnin issa soal."  The video also captured a person believed to be RAMOS-CORRALES saying, "I smoked his little ass.  Like that homie, this is real life.  I ain't no bitch, I'm cold hearted.  Mo-fucker is dead."

    9.   On the evening of February 13, 2021, RPD officers arrived at a residence on Lou Ella Lane, Riverside, California, which officers knew to be RAMOS-CORRALES's residence.  Officers found RAMOS-CORRALES at the residence with fresh blood stains on his clothes, fresh cut wounds on his hands, and illegal brass

knuckles on his person.  During a subsequent safety sweep of the residence, officers found a small brown dog lying on a bed with a deep gash on the throat.

10.  An RPD officer read RAMOS-CORRALES his Miranda warnings, and he agreed to answer questions.  RAMOS-CORRALES stated the dog had become "moody" with him due to pooping inside his cage.  The dog nipped RAMOS-CORRALES which caused him to lose control.  RAMOS-CORRALES called himself a "cold blooded killer" and said he could not stop himself from hurting the dog. RAMOS-CORRALES identified his cellphone as a silver Samsung Galaxy with a black case, which was later recovered by the RPD.

11.  RAMOS-CORRALES consented for RPD to search his bedroom.  RPD Officers found two silver knives, black brass knuckles, and a silver Samsung Galaxy cellphone.  RPD Officers took digital photos of the room that captured blood splatters on the bedroom floorboard, sheets, and the wall.  RAMOS-CORRALES's bathroom had blood splatters on the floorboard, sink and bathtub.  The photographs of RAMOS-CORRALES showed blood on RAMOS-CORRALES's sweatshirt and bite marks on his hands.

### V.   **STATEMENT OF PROBABLE CAUSE**

12.  Based on my review of the reports produced and evidence gathered, conversations with law enforcement officers and witnesses, and participation in this investigation, I am aware of the following.

///

///

**Riverside Police Investigation**

13.   On March 4, 2021, I reviewed an RPD report submitted by RPD Officer Devan HUSSEY ("HUSSEY") in File number 210004466, dated February 24, 2021, and learned the following:

a.   On February 13, 2021, at approximately 7:45 p.m., HUSSEY and RPD Officer Devin DURAN responded to a residence on Lou Ella Lane, Riverside, California for a potential animal cruelty investigation.

b.   Before going to that address, HUSSEY contacted the initial reporting person ("RP").  The RP told HUSSEY that she was contacted at around 6 p.m. that day by an acquaintance of RAMOS-CORRALES who asked the RP to report RAMOS-CORRALES's posting of a video of a dog with its throat slit on Snapchat. The RP said RAMOS-CORRALES had admitted to the killing and stated there was more to follow.  The RP gave HUSSEY RAMOS-CORRALES's name and his residential address on Lou Ella Lane in Riverside.  The RP described RAMOS-CORRALES as a 19-year-old Hispanic male.

c.   The RP also provided a copy of the video (the "Snapchat Video"), which RAMOS-CORRALES's acquaintance had sent the RP, to HUSSEY.  HUSSEY reviewed the copy of the Snapchat Video on the RP's phone, which was approximately 20 seconds long.  HUSSEY described the video as follows:

"A small brown dog is seen laying on its right side with a large laceration to the neck.  Next to the dog was an open bottle of hydrogen peroxide and a black collar, which appear cut.  A caption at the bottom of the screen read,

'Tha next one rinnin issa soal.'  The dog is heard whaling and gasping for air[2] as [RAMOS-CORRALES] stands over the body.  The video captures [RAMOS-CORRALES] saying, "I smoked his little ass. Like that homie, this is real life. I ain't no bitch, I'm cold hearted. Mo-fucker is dead." During these statements, [RAMOS-CORRALES] made finger gestures at the dog's body, similar to portraying gang signs.  At no point did [RAMOS-CORRALES] attempt to help care for the dog.  The video concluded after the statement."

    d.    Upon arrival at the Lou Ella Lane address, HUSSEY observed a young Hispanic adult male wearing a light gray hoodie, dark jeans, and black shoes, exit the residence.  The man appeared to fit the description of RAMOS-CORRALES that the RP had given and the clothing worn by the person in the Snapchat Video.  When the man saw the police vehicle, he started to retreat back into the residence.  HUSSEY asked the man to come over to the officers before he entered the residence.  The man complied and came toward the officers, but he appeared to be very nervous and suspicious.

---

[2] Based on my further investigation, I do not believe the wailing and gasping sound was coming from the dog.  Instead, as confirmed to me later by RAMOS-CORRALES's sister, J.R., the wailing sound was coming from J.R. who was crying due to the injury to the dog, which J.R. shared with RAMOS-CORRALES. Because J.R. was crying while the Snapchat Video was being video recorded by J.R.'s boyfriend using a different phone, the sound of J.R.'s wailing was recorded with the Snapchat Video.

e.    The man identified himself as RAMOS-CORRALES. HUSSEY observed fresh blood stains on RAMOS-CORRALES's hoodie and cut wounds on his hands.

f.    Based on the suspected animal cruelty conduct and potential weapons involved in that conduct, HUSSEY did a patdown search of RAMOS-CORRALES and found black brass knuckles, an illegal weapon in violation of California Penal Code Section 21810.  After the discovery of the illegal weapon, RAMOS-CORRALES was detained and handcuffed.

g.    HUSSEY asked RAMOS-CORRALES about other occupants inside the Lou Ella Lane residence.  He stated he had a roommate who was inside, but he refused to say where his roommate would be located inside.

h.    Due to the reported violence at the residence, RAMOS-CORRALES's fresh wounds and blood stains, recovered weapon, and suspicious behavior, and acknowledged presence of a roommate inside the residence, HUSSEY believed there was an exigent circumstance to enter the residence to ascertain the safety of the roommate.

i.    HUSSEY entered the residence and conducted a safety sweep of the residence.  During the sweep, HUSSEY observed a small brown dog laying on a bed with its throat cut. HUSSEY continued the sweep and found the roommate, M.C., in a different bedroom.  HUSSEY escorted M.C. out of the residence.

j.    After exiting the residence, HUSSEY told RAMOS-CORRALES that she was doing an animal cruelty and brass knuckles possession investigation.  HUSSEY read RAMOS-CORRALES his

<u>Miranda</u> rights and asked him if he was willing to speak about the incident. RAMOS-CORRALES agreed to answer HUSSEY's questions and gave the following statements:

  i.  RAMOS-CORRALES said he was inside his room most of the day, alone with the dog, and smoking marijuana.

  ii.  He stated the dog became "moody" and pooped inside his cage. The dog was also nipping at RAMOS-CORRALES, which caused him to lose control.

  iii. RAMOS-CORRALES claimed he did not recall exactly what he did to the dog, but stated the dog was "still breathing." He referred to himself as a "cold blooded killer" and said he could not stop himself from hurting the dog. But he also said he felt remorse for what he did to the dog and said he even put cleaning alcohol on the dog to help after cutting the dog's throat.

  iv.  RAMOS-CORRALES stated that after his brother had been transformed by gang violence, he became "cold" and wanted to cause pain.

  v.  When asked why he posted the Snapchat Video, RAMOS-CORRALES refused to answer, but asked how RPD discovered his posts. He did identify his cellphone as the silver Samsung Galaxy with a black case on the bed.

  vi. RAMOS-CORRALES could not identify the knife used to injure the dog but kept saying he hurt the dog because he was a cold blooded killer.

vii. RAMOS-CORRALES stated he did not have mental health issues, that he had not previously harmed an animal, or that he was homicidal.

k.   RAMOS-CORRALES then gave consent for the officers to search his bedroom.  During the search, HUSSEY recovered a short silver knife on RAMOS-CORRALES's bed and a longer silver knife near the residence's front door.  RAMOS-CORRALES's silver Samsung Galaxy cellphone was recovered from his bed.

l.   The Samsung Galaxy, in addition to the black brass knuckles and other evidence gathered, was booked into RPD Evidence.

m.   Officer DURAN took 88 digital photographs of the crime scene and attached them to RPD File Number 210004466.

14.  On March 4, 2021, I reviewed an RPD report submitted by RPD Officer Sergio MERCADO ("MERCADO") in File number 210004466-001, dated February 24, 2021, and learned the following:

a.   Sometime after 7:42 p.m. on February 13, 2021, while Officers HUSSEY and DURAN were investigating RAMOS-CORRALES, MERCADO arrived with his partner, RPD Officer LaPoint, and assisted with the interview of M.C. in Spanish, outside RAMOS-CORRALES's residence.

b.   M.C. said he rented a room in RAMOS-CORRALES's residence and knew that RAMOS-CORRALES was the landlord's son.

c.   M.C. said at approximately 5:00 p.m. that day, he returned to the residence and saw that RAMOS-CORRALES appeared to be upset and yelling unknown words in his bedroom.

      d.   M.C. said he saw the puppy wrapped in a bathroom floor rug, while RAMOS-CORRALES was in his room yelling.

      e.   M.C. said he also saw blood splatters and became concerned for his own safety, so M.C. then locked himself in his own bedroom.

      f.   M.C. said he did not witness RAMOS-CORRALES harming the dog.

15.   Later in the evening of February 13, 2021, Riverside County Animal Control arrived at the Lou Ella Lane address and took custody of the dog, which was still alive.  Based on my review of the report from Animal Control dated February 13, 2021 at 10:05 p.m., I am aware of the following:

      a.   When the dog was examined by a veterinarian with Animal Control, the dog was determined to be about 10 weeks old.

      b.   The dog exhibited "rythmic [sic] tremors affecting all 4 legs," had "apparently experienced severe blunt trauma to the head and face bilateral[ly]," with the head "distorted with severe swelling and deformity.

      c.   The dog suffered from a "clean cut laceration . . . of neck on the jugular region measuring 4.4 cm," with the laceration "cut through dermis."

      d.   The dog nonetheless had a pulse of 80 beats per minute, although it was non-responsive.

      e.   An X-ray of the dog showed that it had bilateral zygomatic arch fractures and left rib fracture.

> f.   The dog was subsequently euthanized through the use of an injection, after which the dog "died instantly/peacefully."

**Review of Snapchat Video and Digital Photographs**

16.   On March 4, 2021, I reviewed the Snapchat Video referenced in HUSSEY's RPD report, in File Number 210004466.  My observation of the Snapchat Video was generally consistent with the observations made by HUSSEY.  The video was approximately 20 seconds long.

17.   On March 4, 2021, I reviewed the digital photographs referenced in HUSSEY's RPD report, in File Number 210004466, and saw the following, among many others:

> a.   Photo File L2E80108.jpg depicted a brown dog lying on his right side on top of a bed along with a silver Samsung cellphone and a silver knife.  Blood stains were shown on the floorboard in front of the bed.

> b.   Photo File L2E80129.jpg depicted a blood stain on the wall next to the bed in which the dog was lying.

> c.   Photo File L2E80143.jpg depicted a blood stains on the bathroom sink used by RAMOS-CORRALES.

> d.   Photo File L2E80155.jpg depicted feces inside a dog cage.

> e.   Photo File L2E80157.jpg depicted RAMOS-CORRALES after his arrest, wearing a light gray hoodie that appeared to have a blood stain.

> f.   Photo File L2E80166.jpg depicted RAMOS-CORRALES's hands that appeared to have bite marks.

18.  On March 4, 2021, during my review of the RPD File Number 210004466, I reviewed an RPD Notice to Appear, serial number 801860, written to "Angel Ramos," with a date of birth in 2002.  The charges, both felonies, were listed as PC 597(B), Animal Cruelty, and PC 21810, Possession of Metal Knuckles.

19.  Also on March 4, 2021, I queried law enforcement database and found the California Driver's License ("CDL") information for RAMOS-CORRALES under CDL ending in 5939.  I reviewed the photo for CDL ending in 5939 and compared the attached photo with photo file L2E80157.jpg, described above. The persons depicted in both photos appeared to be the same person.  As further discussed below, on March 5, 2021, I met with RAMOS-CORRALES and confirmed that he was the same person depicted the RPD photos and CDL photo.

**Follow-up Interviews of RAMOS-CORRALES and Witnesses**

20.  On March 4 and 5, 2021, FBI SA Travis Rankin, Jazmin Vidana, and I conducted interviews of witnesses in this investigation, as well as a Mirandized interview of RAMOS-CORRALES.  The following are summaries of those interviews relevant to this search warrant application.

21.  On March 4, 2021, FBI SA Rankin, Vidana, and I met with RAMOS-CORRALES at his Lou Ella Lane residence.  I gave a Miranda warning to RAMOS-CORRALES, and he agreed to speak with us.  RAMOS-CORRALES said the following to us:

a.  RAMOS-CORRALES identified himself as the person who posted the Snapchat Video but claimed he did not recall the details of what he did.  He claimed that he had taken a mix of

14

drugs and alcohol.

   b.   RAMOS-CORRALES said the name of the dog was
"Canelo," which he bought for $30 from a family that placed the
dog for sale through a posting on Craiglist, online classified
advertisements website.   RAMOS-CORRALES said he bought the dog
about four or five months earlier when the dog was a small
puppy.

   c.   When RAMOS-CORRALES was shown a photograph of the
Samsung Galaxy that RPD took on February 13, 2021, he
acknowledged that the phone was his.

   d.   RAMOS-CORRALES also acknowledged that he used
Snapchat and Instagram, as his social media.   RAMOS-CORRALES
provided his Snapchat and Instagram names.   His Snapchat display
name is "Chencho" and user name "bln00100".   His Instagram user
name is "minis_6".

   e.   Although RAMOS-CORRALES said he did not recall
what exactly he did to Canelo, he admitted he had flashbacks of
the incident and recalled pouring alcohol over the dog.   He also
stated that he posted to Snapchat at least one photo of himself
drinking alcohol on the same night of the incident.

   22.   On March 4, 2021, FBI SA Rankin, Vidana, and I met
with J.R., sister of RAMOS-CORRALES, at the Lou Ella Lane
residence.   J.R. said the following to us:

   a.   J.R. said she was RAMOS-CORRALES's older sister
and she also lived in the Lou Ella Lane residence.

   b.   J.R. said she learned about RAMOS-CORRALES's
slitting of his dog while she was traveling in Mexico.   One of

her cousins called J.R. to let her know that RAMOS-CORRALES had posted a video of injury to the dog on social media.

c.   J.R. said she was not aware of RAMOS-CORRALES harming animals or posing other similar videos of causing injury to animals.

d.   J.R. said her oldest brother was in and out of prison.  She said RAMOS-CORRALES was a sort of a "poser" who might have wanted to impressed other people by posting the Snapchat Video.  She thought RAMOS-CORRALES might be trying to impress their older brother who is currently in prison.

e.   After listening the audio of a video recording of the Snapchat Video that the RPD obtained from the RP, J.R. said the sound of wailing heard in the video is that of herself crying over the injury to the dog.

23.   On March 5, 2021, FBI SA Rankin, Vidana, and I met with RAMOS-CORRALES for a follow-up interview at the Lou Ella Lane residence.  I gave a <u>Miranda</u> warning to RAMOS-CORRALES, and he agreed to speak with us.  RAMOS-CORRALES said the following to us:

a.   RAMOS-CORRALES had been home all day on the day he slit the dog's throat.  He had started drinking in the morning, listened to music, and exchanged text messages with other people, including on Snapchat.

b.   RAMOS-CORRALES still said he did not recall the details of what he did to the dog and why he did it.

c.   RAMOS-CORRALES said a cousin (whose name he said he did not recall) called him at some point after he posted the

video to ask what he was doing.

      d.   RAMOS-CORRALES said he "freaked out" after he realized that he had slit the dog's throat.

      e.   RAMOS-CORRALES said he did not recall how many people viewed, responded to, or saved the video he posted.

    24.  During the same interview on March 5, 2021, RAMOS-CORRALES showed us his Snapchat account on his new cellphone and agreed to have us take a look at his postings and chats from February 13, 2021.  We reviewed RAMOS-CORRALES's "friend" list and saw that there were 19 people on the list.

**Interview of Individuals Who Sold the Dog to RAMOS-CORRALES**

    25.  On March 30, 2021, FBI SA James Lamothe and Steven Gale interviewed J.G. and D.R., husband and wife, in their residence in Apple Valley, California.  During the interview, J.G. stated that he and his wife sold a dog to RAMOS-CORRALES, as identified through a photograph of RAMOS-CORRALES.  Based on my review of the report completed by SA Lamothe and Gale and my conversation with the two SAs, I am aware of the following:

      a.   When shown a photograph of RAMOS-CORRALES, J.G. stated that he recognized the male in the photograph as the person who bought a dog from J.G. and his family.  J.G. stated that his family had posted a Craigslist ad using D.R.'s email address to sell a recently born puppy that the family had.  J.G. said when RAMOS-CORRALES came to buy the puppy, he was accompanied by a female, short in height.

      b.   J.G. said that the puppy was being sold for $30, and there were two people interested in buying the puppy.  J.G.

said RAMOS-CORRALES was eager to buy the puppy and offered to pay $45 to come pick the puppy up as soon as possible.

        c.   J.G. recalled that RAMOS-CORRALES was driving from Riverside.

    26.  During the interview, J.G. and D.R. provided SAs Lamothe and Gale with copies of emails and messages showing communications concerning the sale of the dog.

**Execution of Search Warrants**

    27.  On March 9, 2021, the Honorable Sheri Pym, United States Magistrate Judge, approved two search warrants in this investigation for (1) RAMOS-CORRALES's Snapchat account under username "bln00100" and display name "Chencho," in case number ED 21-MJ-150, and (2) a Samsung Galaxy belonging to RAMOS-CORRALES, in case number ED 21-MJ-151.

    28.  Between March 9 and 23, 2021, I conducted a search of RAMOS-CORRALES's Samsung Galaxy pursuant to the search warrant in case number ED 21-MJ-151.  During that search, I found the following, among others:

        a.   Text/instant messages showing that RAMOS-CORRALES bought the deceased dog on November 16, 2020 from a person who had the telephone number of 909-831-XXXX, residing in Apple Valley, California, with the same address as J.G. and D.R.

        b.   A message string with 909-831-XXXX detailing conversations regarding the dog purchase transaction on November 15, 2020.

    29.  On April 21, 2021, Snapchat produced information and digital data responsive to the search warrant pursuant to 18

U.S.C. § 2703 in case number ED 21-MJ-150.

     a.    Within that production were copies of the Snapchat Video depicting a dog with the throat slit, along with the "overlay" file that showed the text associated with the Snapchat Video, "The next one I rinnin issa soal," dated February 13, 2021, at 6:42 p.m.

     b.    After watching the Snapchat Video, I confirmed that that video was the same video that the initial reporting party (RP) provided to the RPD on February 13, 2021, but without the wailing sound that I previously learned was made by RAMOS-CORRALES's sister, as described above.

     c.    I also saw that, toward the end of the Snapchat Video, RAMOS-CORRALES kicked the dog callously and said, "Mo-fucker is dead."

     d.    Also in the same production was the content of Snapchat messages exchanged between RAMOS-CORRALES's account bln00100 and his Snapchat friends, which included other individuals addressing bln00100 as "Angelllll" and bln00100 providing RAMOS-CORRALES's Lou Ella Lane address to another person.

     e.    The Snapchat message content included messages exchanged starting at 6:43 p.m. on February 13, 2021.[3] Those messages showed RAMOS-CORRALES's bln00100 account sending out multimedia messages to several others at 6:43 p.m., consistent

_____

[3] The time marks on the chat log are in Universal Time Coordinated ("UTC") time, which was eight hours ahead of Pacific Standard Time ("PST") on February 13, 2021. Thus, chat messages logged as taking place on February 14, 2021 at 2:43 a.m. UTC was on February 13, 2021 at 6:43 p.m.

with the posting of a video to a group.  At 6:44 p.m., one individual wrote to bln00100, "Eww."  At 7:13 p.m., another individual wrote, "Foo I hope you didnâ€™t [sic] do that [J.R.] is doing the most rn."  At 7:31 p.m., a third individual wrote, "You just need to stop hanging out with the wrong crowd."

       f.   Also in the same Snapchat production was another video dated February 25, 2021, showing a man in possession of what appears to be marijuana and making the same "gang sign" finger gesture with the left hand in the same manner that RAMOS-CORRALES made a finger gesture in the Snapchat Video.  Although the man's face is not visible, the man is wearing the same colored and brand of shoes as RAMOS-CORRALES in the Snapchat Video and the flooring shown on this video is the same as the flooring shown in the Snapchat Video.

///

///

///

## VI.  <u>CONCLUSION</u>

30.  Based upon the evidence described above, I submit that probable cause exists to support the issuance of a criminal complaint against Angel RAMOS-CORRALES ("RAMOS-CORRALES") with a violation of Title 18, United States Code, Section 48(a)(1) (Animal Crushing).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 23rd day of
April 2021.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE